## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

YUSEF SALAAM,
RAYMOND SANTANA,
KEVIN RICHARDSON,
ANTRON BROWN,
and KOREY WISE,

                Plaintiffs,

v.

DONALD J. TRUMP,

                Defendant.

CIVIL NO. 2:24-CV-05560

AMENDED COMPLAINT

JURY TRIAL DEMANDED

## <u>AMENDED COMPLAINT</u>

1.     This case involves false and defamatory statements made by Defendant, Donald J. Trump, during a presidential debate that took place on September 10, 2024, in Philadelphia, Pennsylvania.

2.     During the debate, Defendant Trump made several statements concerning the "Central Park Five." The Central Park Five, now also known as the Exonerated Five, are five individuals who, as teenagers, were wrongfully convicted of a series of assaults that occurred in Central Park, New York City on April 19, 1989.

3.     The Central Park Five, or Exonerated Five, is comprised of Plaintiffs Yusef Salaam, Raymond Santana, Kevin Richardson, Antron Brown and Korey Wise. Plaintiffs were wrongfully convicted of crimes they did not commit when they were between fourteen and sixteen years old and spent the formative years of their lives in prison.

4.     In 2002, based on newly discovered DNA evidence and the confession of the true perpetrator, Plaintiffs were exonerated. Plaintiffs have spent the last two decades attempting

to rebuild their lives.

5.       At the September 10, 2024 presidential debate, Defendant Trump falsely stated that Plaintiffs killed an individual and pled guilty to the crime. These statements are demonstrably false. Plaintiffs never pled guilty to any crime and were subsequently cleared of all wrongdoing. Further, the victims of the Central Park assaults were not killed.

6.       Plaintiffs have suffered injuries as a result of Defendant Trump's false and defamatory statements and bring this lawsuit to obtain redress.

## THE PARTIES

7.       Plaintiff Yusef Salaam is now 50 years old and is a New York City Council Member representing District Nine, although he brings suit here only in his personal capacity. Plaintiff Salaam is a citizen and resident of the State of New York.

8.       Plaintiff Raymond Santana is now 50 years old and is an author, fashion designer and civil rights advocate. Plaintiff Santana is a citizen and resident of the State of Georgia.

9.       Plaintiff Kevin Richardson is now 50 years old and is a motivational speaker and philanthropist. Plaintiff Richardson is a citizen and resident of the State of New Jersey.

10.      Plaintiff Antron Brown (formerly known as Antron McCray) is now 50 years old and is retired. Plaintiff Brown is a citizen and resident of the State of Georgia.

11.      Plaintiff Korey Wise is now 52 years old and is a civil rights advocate. Plaintiff Wise is a citizen and resident of the State of New York.

12.      Defendant Donald J. Trump is the President of the United States, although he is sued here only in his personal capacity. Defendant Trump is a citizen and resident of the State of Florida.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction because the Plaintiffs and the Defendant are citizens of different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. *See* 28 U.S.C. § 1332(a).

14.     Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this District. *See* 28 U.S.C. § 1391(b)(2).

15.     The Court has personal jurisdiction over Defendant Trump pursuant to Pennsylvania's long-arm statute. *See* 42 Pa. C.S. § 5322.

## FACTUAL ALLEGATIONS

**A.      The "Central Park Five" Case**

16.     On the night of April 19, 1989, Ms. Patricia Meili was assaulted and raped while jogging in Central Park.

17.     On the same night, Mr. David Lewis and Mr. John Loughlin were assaulted while jogging in a different part of the park.

18.     Plaintiffs, who were between fourteen and sixteen years old at the time, were taken in for questioning in connection with these crimes. Plaintiffs would come to be collectively known as the "Central Park Five," and later, the "Exonerated Five."

19.     While in police custody, Plaintiffs were each separately subjected to hours of coercive interrogation, under duress, with no attorney present and often without a parent or guardian present.

20.     Plaintiffs initially denied having any knowledge of the Central Park assaults. However, after hours of interrogation, four of the Plaintiffs agreed to provide written and videotaped statements in which they falsely admitted to having been present during the assaults.

21.     Plaintiff Salaam did not provide a written or videotaped statement because his mother intervened during his interrogation. However, the police detectives allegedly took notes of his responses during his hours-long interrogation, in which Plaintiff Salaam also purportedly admitted to having been present during the assaults.

22.     The statements were contradictory, unreliable and inconsistent with each other and with the objective evidence of the assaults.

23.     In fact, Plaintiffs were not involved in the assaults in any way, and their statements were the product of coercion and duress. Plaintiffs all recanted their coerced statements shortly after their interrogations.

24.     On May 1, 1989, only eleven days after the horrendous assault on Ms. Meili took place, and while public sentiment against these young boys was still high, Defendant Trump published a full-page advertisement in four New York City newspapers. The advertisement alluded to the assaults in Central Park without specifically identifying the suspects and called for the City of New York to "[s]end a message loud and clear to those who would murder our citizens and terrorize New York—BRING BACK THE DEATH PENALTY AND BRING BACK OUR POLICE!"

25.     A true and correct copy of the advertisement is attached as Exhibit "A."

26.     On May 4, 1989, Plaintiffs were indicted and charged with attempted murder, rape, sodomy, assault, robbery, sexual abuse and riot.

27.     Plaintiffs pled not guilty on all counts. They would all maintain their innocence throughout their trials and years in prison—even when this later hindered them from obtaining parole and extended their incarcerations.

28.     Plaintiffs Salaam, Santana and Brown were tried jointly beginning June 25,

1990. After ten days of deliberation, the jury convicted each of them of assault in connection with the attack on Mr. Lewis, assault and robbery in connection with the attack on Mr. Loughlin, assault and rape in connection with the attack on Ms. Meili, and of riot. The jury acquitted each of them of attempted murder and sodomy.

29.    Plaintiffs Richardson and Wise were tried jointly beginning October 22, 1990. After eleven days of deliberation, the jury convicted Plaintiff Richardson on all counts. Plaintiff Wise was convicted of assault and sexual abuse with respect to the attack on Ms. Meili, and of riot. He was acquitted of the remaining charges.

30.    As the Manhattan District Attorney's Office would later acknowledge in court filings: "the People's case at both trials rested almost entirely on the statements made by the defendants" during their interrogations. In fact, there was no forensic evidence that linked these five youths to this offense.

31.    Plaintiff Wise was sentenced as an adult to serve five to fifteen years in prison. The remaining Plaintiffs were sentenced as juveniles to serve five to ten years.

32.    While in prison in 2002, Plaintiff Wise met the true perpetrator of the attack on Ms. Meili, Matias Reyes, who was incarcerated at the same prison for a series of rapes committed around the same time as the Central Park assaults. After the encounter, Reyes confessed to prison staff that he was the true perpetrator of the assault and rape of Ms. Meili.

33.    Following his confession to prison staff, Reyes met with prosecutors from the Manhattan District Attorney's Office and provided details that only the true perpetrator could have known. The police also performed a DNA test that conclusively showed that Reyes was the true perpetrator. Prior DNA tests on the five who were convicted of these crimes were negative in all respects.

34.     Following these revelations, the Manhattan District Attorney's Office reopened its investigation into the Central Park assaults.

35.     At the conclusion of a thorough re-investigation, Nancy Ryan, the Chief of the Trial Division of the District Attorney's Office, filed an affirmation on behalf of the District Attorney's Office recommending that Plaintiffs' convictions be vacated and that the indictments be dismissed.

36.     Ms. Ryan wrote: "the People's case at both trials rested almost entirely on the statements made by the defendants. . . . But a comparison of the statements reveals troubling discrepancies. . . . The accounts given by the five defendants differed from one another on the specific details of virtually every major aspect of the crime – who initiated the attack, who knocked the victim down, who undressed her, who struck her, who held her, who raped her, what weapons were used in the course of the assault, and when in the sequence of events the attack took place… In many other respects the defendants' statements were not corroborated by, consistent with, or explanatory of objective, independent evidence. And some of what they said was simply contrary to established fact."

37.     Given the unreliability of the statements, as well as the "newly discovered" and "incontrovertible proof" tying Matias Reyes to the assault, the District Attorney's Office recommended that the charges relating to the attack on Ms. Meili be vacated.

38.     With respect to the attacks on Mr. Lewis and Mr. Loughlin, Ms. Ryan stated: "[T]he trial evidence as to the other charges, like the evidence as to the attack on the female jogger, consisted almost entirely of the defendants' statements." Consequently, "there was no significant evidence at trial establishing the defendants' involvement in the other crimes of which they stand convicted that would not have been substantially and fatally weakened by the newly

discovered evidence in this matter."

39.    On December 19, 2002, New York Supreme Court Justice Charles J. Tejada vacated Plaintiffs' convictions and dismissed the indictments, as the District Attorney's Office had recommended.

40.    In 2003, Plaintiffs brought suit against the City of New York for, among other things, false arrest, malicious prosecution and racially motivated conspiracy. The lawsuit settled for $41 million in 2014, with then-Mayor De Blasio stating that the settlement was a "moral obligation to right this injustice."

**B.    The September 10, 2024 Presidential Debate**

41.    On September 10, 2024, Defendant Trump participated in a presidential debate hosted at the National Constitution Center in Philadelphia, Pennsylvania. The debate was watched live by more than 67 million people in the United States. The video and transcript of the debate have since been viewed by many others.

42.    During the segment of the debate dedicated to "race and politics in this country," Defendant Trump's opponent, Vice President Kamala Harris, made the following statement: "Let's remember, this is the same individual [Trump] who took out a full-page ad in The New York Times calling for the execution of five young Black and Latino boys who were innocent, the Central Park Five. Took out a full-page ad calling for their execution."

43.    Vice President Harris's comment came as part of a longer answer relating to "race and politics."

44.    Defendant Trump responded: "[T]hey come up with things like what she just said going back many, many years when a lot of people including Mayor Bloomberg agreed with me on the Central Park Five. They admitted – they said, they pled guilty. And I said, well, if they

pled guilty they badly hurt a person, killed a person ultimately. And if they pled guilty – then they pled we're not guilty."

45.     Defendant Trump's statements came as part of a longer response to Vice President Harris's comments.

46.     A true and correct videorecording of the debate is available at the following link: https://abcnews.go.com/Politics/watch-full-abc-news-presidential-debate/story?id=113470583. The relevant portion of the debate can also be accessed at the following link: https://exoneratedfiveversustrump.com. A video of the relevant portions of the debate has also been provided to the Court.

47.     Defendant Trump's statements were of or concerning Plaintiffs, collectively known as the "Central Park Five."

48.     Defendant Trump's statements were false and defamatory in numerous respects.

49.     Plaintiffs never pled guilty to the Central Park assaults. Plaintiffs all pled not guilty and maintained their innocence throughout their trial and incarcerations, as well as after they were released from prison.

50.     None of the victims of the Central Park assaults were killed.

51.     Also, Michael Bloomberg, referenced in Mr. Trump's remarks, would not become mayor of New York until 2002.

52.     Rather, the mayor at the time of the Central Park assaults was Ed Koch. Mayor Koch emphatically did not agree with Defendant Trump's statements regarding the assaults. In fact, in the 1989 advertisement, Defendant Trump acknowledged: "Mayor Koch has stated that hate and rancor should be removed from our hearts. I do not think so." In response to Mr. Trump's advertisement, Mayor Koch was quoted as saying: "Nobody I know of in Western

society believes that under any circumstances would you ever impose the death penalty on juveniles." Further, during a 1989 interview discussing the Central Park Five, Mayor Koch carefully noted: "We always have to say 'alleged' because that's the requirement."

53.    Defendant Trump also omitted key facts from his statements, further rendering them false, misleading and defamatory. These include, among other things, the fact that the Manhattan District Attorney's Office later acknowledged that the teens' confessions were unreliable and conflicted with the objective evidence; that four of the five were acquitted of attempted murder; that all five men's convictions were later vacated; that the true perpetrator, Matias Reyes, confessed; that DNA evidence confirmed that Reyes was the true perpetrator; and that the City of New York agreed to pay $41 million for its conduct toward Plaintiffs.

54.    Defendant Trump's statements of or concerning Plaintiffs on September 10, 2024 were made negligently, with knowledge of their falsity and/or with reckless disregard for their falsity.

55.    Defendant Trump's false and insulting statements about Plaintiffs were defamation *per se* in that they ascribe to Plaintiffs the commission of criminal offenses, including offenses for which Plaintiffs have never been charged or accused, offenses for which they were acquitted at trial, and offenses for which they were conclusively exonerated and their convictions vacated.

56.    Defendant Trump's statements about Plaintiffs were also defamation *per se* because the Central Park assaults involved rape, and thus, by ascribing the commission of the assaults to Plaintiffs, Defendant Trump was also ascribing to Plaintiffs serious sexual misconduct.

57.    Defendant Trump's conduct at the September 10 debate was extreme and

outrageous, and it was intended to cause severe emotional distress to Plaintiffs.

58.     Plaintiff Salaam attended the September 10 debate in person and was in the room when Defendant Trump made his false and defamatory statements.

59.     After the debate, Defendant Trump passed through the post-debate "spin room" fielding questions from attendees.

60.     As Defendant Trump approached Plaintiff Salaam, other attendees asked Defendant Trump, "Will you apologize to the Exonerated Five?" and "Sir, what do you say to a member of the Central Park Five, sir?"

61.     When Defendant Trump did not respond, Plaintiff Salaam said, "President Trump, I'm Yusef Salaam, one of the Exonerated Five. How are you doing?"

62.     Defendant Trump responded, "Ah, you're on my side then."

63.     Plaintiff Salaam then said, "No, no, no, I'm not on your side."

64.     Defendant Trump proceeded to wave his hand at Plaintiff Salaam, smile and walk away.

65.     Plaintiff Salaam was attempting to politely dialogue with Defendant Trump about the false and defamatory statements that Defendant Trump had made about Plaintiffs less than an hour earlier, but Defendant Trump refused to engage with him in dialogue.

66.     A recording of the exchange can be accessed at the following link: https://exoneratedfiveversustrump.com. The video of the exchange has also been provided to the Court.

**C.      Defendant Trump's pattern of wrongful conduct toward Plaintiffs**

67.     Defendant Trump's conduct at the September 10 debate was part of a continuing pattern of extreme and outrageous conduct toward Plaintiffs stretching back decades.

68.    Defendant Trump has previously made numerous public statements demonstrating that he is familiar with the Central Park assaults, the criminal case, the trials, the exoneration and the settlement with the City, and that he therefore knew that the statements he made on September 10, 2024 were false and misleading.

69.    Like his statements at the September 10 debate, many of Defendant Trump's past statements are themselves false, defamatory and part of a continuing pattern of extreme and outrageous conduct directed at Plaintiffs.

70.    Defendant Trump intentionally made inflammatory and harmful public statements about Plaintiffs when Plaintiffs were first arrested, and when Plaintiffs resolved their lawsuit with the City of New York on favorable terms. He also intentionally made inflammatory and harmful public statements about Plaintiffs following the release of a 2014 documentary entitled "The Central Park Five" and a 2019 TV series entitled "When They See Us" that were sympathetic to Plaintiffs.

71.    This timing was not a coincidence. Defendant Trump makes inflammatory and harmful statements about Plaintiffs during periods where they are the subject of public interest to diminish positive public sentiments toward Plaintiffs and prevent Plaintiffs from clearing their names of wrongdoing in the eyes of the public despite their exoneration.

72.    By Defendant Trump's own admission, this decades-long pattern of conduct toward Plaintiffs is borne out of personal animus and an intent to make the men suffer. As Defendant Trump stated in his 1989 advertisement: "I want to hate these muggers and murderers. They should be forced to suffer . . . I want to hate these murderers and I always will . . . I am looking to punish them . . . I want them to understand our anger. I want them to be afraid." Defendant Trump also stated that "Mayor Koch has stated that hate and rancor should be removed

from our hearts. I do not think so."

73.    Defendant Trump has also admitted that he has made and continues to make his inflammatory and harmful statements about Plaintiffs to benefit himself politically and improve his standing in the eyes of the public. In 2016, when asked by his biographer whether Defendant Trump's confrontational public persona might harm him politically, Defendant Trump immediately brought up his treatment of Plaintiffs as a counterexample, stating: "I think it will help me. I think people are tired of politically correct. I just attacked the Central Park Five settlement. Who's going to do that?"

74.    Defendant Trump's pattern of extreme and outrageous conduct began on May 1, 1989, when, just 11 days after the attack in Central Park and shortly after Plaintiffs were arrested, Defendant Trump placed the ad attached as Exhibit "A."

75.    Defendant Trump published this inflammatory and hateful ad to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing at Plaintiffs' expense.

76.    On May 17, 1989, Defendant Trump was interviewed by Larry King about the ad. Defendant Trump stated during the interview that "maybe hate is what we need if we're gonna get something done," falsely claimed that Patricia Meili was "thrown off a building – thrown off a building on top of everything else," and boasted that "I have never done anything that's caused a more positive stir. I've had 15,000 – 15,000 – letters in the last week and a half."

77.    Defendant Trump published this inflammatory and hateful statement to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing at Plaintiffs' expense.

78.     On November 23, 2012, PBS released a film by documentarian Ken Burns titled "The Central Park Five." The documentary describes in detail the true circumstances of the Central Park assaults, the subsequent legal proceedings and the men's ultimate exoneration. The film emphasized that the Central Park Five or Exonerated Five never pled guilty and that the victim did not die.

79.     The film was critically acclaimed and created positive public sentiment about Plaintiffs.

80.     On April 24, 2013, Defendant Trump tweeted his impressions of the documentary, which he described as a "one sided piece of garbage that didn't explain the.horrific [sic] crimes of these young men while in park [sic]."

81.     This statement (written long after Plaintiffs had been exonerated) was itself false, defamatory and part of a continuing pattern of extreme and outrageous conduct.

82.     Given that Defendant Trump has seen the film, and further given that he had closely followed the story of the Central Park assaults from the outset, he knew that his statements at the September 10 debate were false, misleading and defamatory.

83.     Defendant Trump published this inflammatory and hateful statement to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing at Plaintiffs' expense.

84.     Defendant Trump falsely stated in his April 24, 2013 tweet about the documentary that the Central Park Five committed "horrific crimes . . . while in park [sic]." This statement, written long after Plaintiffs had been exonerated, was itself false, defamatory and part of a continuing pattern of extreme and outrageous conduct.

85.     On June 29, 2013, a Twitter user asked Defendant Trump: "How do you feel that

the central park 5 were innocent." Defendant Trump responded: "Innocent of what-how many people did they mugg [sic]?"

86.    Defendant Trump did not claim in this tweet that Plaintiffs had pled guilty to assaulting and killing someone like he did at the September 10 debate, because he knows that this is false.

87.    However, Defendant Trump stated in his June 29, 2013 tweet that Plaintiffs were guilty of mugging. This statement was itself false, defamatory and part of a continuing pattern of extreme and outrageous conduct.

88.    Defendant Trump published this inflammatory and hateful statement to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing at Plaintiffs' expense.

89.    On June 19, 2014 Plaintiffs and the City of New York agreed to settle Plaintiffs' civil lawsuit against the City.

90.    Just two days later, on June 21, 2014, Defendant Trump wrote an editorial in the New York Daily News regarding the civil settlement in which he stated that the settlement was a "disgrace," that "[s]ettling doesn't mean innocence," that "[t]hese young men do not exactly have the pasts of angels," and asked rhetorically: "What about the other people who were brutalized that night, in addition to the jogger?"

91.    Defendant Trump did not claim in this editorial that Plaintiffs had pled guilty to assaulting and killing someone like he did at the September 10 debate, because he had followed the story of the Central Park assaults from the outset and knows that this is false.

92.    However, Defendant Trump's derogatory comments and insinuations of criminality directed at Plaintiffs in the editorial were themselves false, defamatory and part of a

continuing pattern of extreme and outrageous conduct. Notably, Defendant Trump did not acknowledge or reference Plaintiffs' exoneration in any way in this editorial.

93.     Defendant Trump published this inflammatory, hateful, and false editorial to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing.

94.     On May 31, 2019, Netflix released a TV show based on the events of the Central Park assault and Plaintiffs' subsequent exoneration, called "When They See Us." The series was critically acclaimed and sympathetic toward Plaintiffs.

95.     On June 18, 2019, Defendant Trump was asked by a reporter: "The Central Park Five, they've been exonerated, there have been movies and videos . . . You came out with a full-page ad saying they should die, they should have the death penalty." Defendant Trump responded: "Why do you bring that question up now? It's an interesting time to bring it up. You have people on both sides of that. They admitted their guilt. If you look at Linda Fairstein and if you look at some of the prosecutors, they think that the City should never have settled that case. So we'll leave it at that."

96.     Defendant Trump did not claim in his response to the reporter that Plaintiffs had pled guilty to assaulting and killing someone like he did at the September 10 debate, because he knew that such a statement would be false.

97.     However, the clear implication of Defendant Trump's statement was that Linda Fairstein, a prosecutor on the Central Park assault case, continues to believe that Plaintiffs were rightfully convicted of assaulting and raping Ms. Meili. In fact, Ms. Fairstein wrote in a Wall Street Journal editorial on June 10, 2019, less than two weeks before Defendant Trump's statement: "Mr. Reyes's confession, DNA match and claim that he acted alone required that the

rape charges against the five be vacated. I agreed with that decision, and still do." Defendant Trump omitted any reference to this statement by Ms. Fairstein during his comments.

98.     Defendant Trump also omitted the fact that Manhattan District Attorney Robert Morgenthau and Chief of the Trial Division Nancy Ryan, who were responsible for overseeing the prosecution, formally recommended that all charges against Plaintiffs be vacated and the indictments dismissed. This further demonstrates that Defendant Trump's June 18, 2019 statement regarding the views of prosecutors on the case were false and misleading.

99.     Defendant Trump's false and misleading statements to reporters on June 18, 2019 were part of a continuing pattern of extreme and outrageous conduct toward Plaintiffs.

100.     Defendant Trump published this inflammatory, hateful and false statement to foment public "hate and rancor" toward Plaintiffs and improve Defendant Trump's own public standing.

101.     Plaintiffs suffered harm, including severe emotional distress and reputational damage, as a direct result of Defendant Trump's false and defamatory statements at the September 10 debate, as well as his continuing pattern of extreme and outrageous conduct.

102.     Plaintiffs have all suffered severe emotional distress and physical injuries as a result of Defendant's extreme and outrageous conduct.

## CAUSES OF ACTION

### COUNT I – DEFAMATION

103.     Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs of the Complaint as though fully set forth herein at length.

104.     Defendant Trump published the above-mentioned statements concerning Plaintiffs, including to individuals in the Eastern District of Pennsylvania.

105.    The aforementioned statements were of or concerning Plaintiffs, also known as the "Central Park Five."

106.    Individuals who heard said statements understood them to refer to Plaintiffs.

107.    The statements were defamatory *per se*.

108.    Defendant Trump made his false and defamatory statements negligently, knowing they were false, and/or with reckless disregard for their truth or falsity.

109.    Defendant Trump made his false and defamatory statements with ill will and spite, and with wanton, reckless or willful disregard for their injurious effects on Plaintiffs.

110.    As a proximate result of Defendant's negligent, malicious, intentional and reckless conduct as set forth above and herein, Plaintiffs are entitled to such damages as will compensate them for their reputational damage, emotional pain and suffering, resultant out-of-pocket costs and expenses, and punitive damages to punish Defendant Trump for his conduct and deter him and others similarly situated from like acts in the future.

111.    In addition to Defendant Trump's directly false statements, Defendant Trump "juxtaposed true facts and/or omitted facts in a way that gives rise to a defamatory implication." *Fanelle v. Lojack Corp.*, No. CIV.A. 99-4292, 2000 WL 1801270, at *3 (E.D. Pa. Dec. 7, 2000).

112.    Publicizing statements regarding criminal accusations or proceedings while omitting exculpatory facts is actionable under Pennsylvania law. *See Purcell v. Westinghouse Broad. Co.*, 191 A.2d 662 (Pa. 1963); *Fanelle*, 2000 WL 1801270, at *1 (applying Pennsylvania law).

113.    As discussed above, Defendants' statements were defamatory because he falsely stated that Plaintiffs "pled guilty" to the assaults, and indeed that they "pled guilty" to having "killed a person." These statements are false and defamatory as a starting point.

114.    In addition, under a defamation-by-implication theory, Defendant Trump is liable because he publicized that Plaintiffs had been prosecuted in relation with the Central Park assaults while omitting crucial and exculpatory facts, including that:

    a.   Four of five Plaintiffs were acquitted of attempted murder;
    b.   The true perpetrator, Matias Reyes, came forward and confessed;
    c.   DNA evidence confirmed that Reyes was the true perpetrator;
    d.   The Manhattan District Attorney's Office reopened its investigation and recommended that all convictions be vacated;
    e.   As part of this investigation, the Manhattan District Attorney's Office concluded that Plaintiffs' confessions were unreliable and conflicted with the objective evidence;
    f.   All five men's convictions were subsequently vacated; and
    g.   The City of New York ultimately agreed to pay $41 million "to right this injustice."

115.    Defendant Trump did not acknowledge Plaintiffs' exoneration in any way during the debate, and reasonable viewers would not have understood Defendant Trump's statements at the debate to be an acknowledgement of Plaintiffs' exoneration.

116.    By publicizing a false and partial account of Plaintiffs' criminal proceedings while omitting reference to subsequent exculpatory facts, Defendant Trump conveyed the false and defamatory implication that Plaintiffs committed these crimes and that they have not been completely exonerated by the Manhattan District Attorney's office and the courts.

117.    Defendant's conduct at the debate was consistent with his years-long pattern of making false statements about Plaintiffs' culpability and prosecution while omitting reference to Plaintiffs' ultimate exoneration.

118.    Reasonable viewers understood Defendant's statements at the debate to imply that Plaintiffs had pled guilty, that they admitted to killing someone, and that Plaintiffs had not been completely exonerated.

119.    During her prior remarks, Vice President Harris described Plaintiffs as "innocent," but Defendant Trump did not reinforce or express his agreement with Vice President Harris's statement. A reasonable viewer would not have understood Defendant Trump to be agreeing with Vice President Harris's characterization of Plaintiffs as "innocent." Vice President Harris also did not follow Defendant Trump's statement with another affirmation of Plaintiffs' innocence and exoneration, such that Defendants' Trump's statement also stood alone as an independent statement of false, defamatory material that was also defamatory-by-implication based on Defendant Trump's failure to describe subsequent events that exculpated and exonerated Plaintiffs.

120.    Defendant Trump's statement that Plaintiffs "pled guilty – then they pled we're not guilty" was not intended to convey that Plaintiffs have been exonerated, and reasonable viewers would not have understood the statement that Plaintiffs "pled we're not guilty" to convey that Plaintiffs have been exonerated. Defendant Trump's statement that "then they pled we're not guilty" was also said in an incredulous, mocking tone.

121.    News coverage of the debate demonstrates that reasonable viewers understood Defendant's statements to imply that Plaintiffs have not been exonerated. For example, NPR reported the day after the debate that "The Central Park 5 are exonerated. Trump doesn't seem to think so." A Guardian article noted,"[O]n the debate stage more than two decades after the exoneration of the teenagers, Trump dug in." NBC news reported that Defendant "continued the refusal [to acknowledge Plaintiffs' exoneration] during the debate." Gothamist reported that "Donald Trump double[d] down on his Central Park Five stance (again)."

122.    Defendant Trump's statements, innuendos and implications were defamatory *per se* in that they tend to ascribe to Plaintiffs serious sexual misconduct and the commission of criminal offenses.

123.    Defendant Trump made his false and defamatory statements, innuendos and implications negligently, knowing they were false, and/or with reckless disregard for their truth or falsity.

124.    Defendant Trump made his false and defamatory statements, innuendos and implications with ill will and spite, and with wanton, reckless or willful disregard for their injurious effects on Plaintiffs.

125.    As a proximate result of Defendant's negligent, malicious, intentional and reckless conduct as set forth above and herein, Plaintiffs are entitled to such damages as will compensate them for their reputational damage, emotional pain and suffering, resultant out-of-pocket costs and expenses, and punitive damages to punish Defendant Trump for his conduct and deter him and others similarly situated from like acts in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Donald J. Trump for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000, and such other relief as this Court deems just and for a trial by jury on all issues so triable.

## COUNT II – FALSE LIGHT

126.    Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs of the Complaint as though fully set forth herein at length.

127.    Defendant Trump's statements placed Plaintiffs in a false light that would be highly offensive to a reasonable person.

128.    Defendant Trump knew that his statements were false and/or acted in reckless disregard as to the falsity of his statements and the false light in which they would place Plaintiffs.

129.    Defendant Trump made his false and offensive statements with ill will and spite, and with wanton, reckless or willful disregard for their injurious effects on Plaintiffs.

130.    As a proximate result of Defendant's negligent, malicious, intentional and reckless conduct as set forth above and herein, Plaintiffs are entitled to such damages as will compensate them for their reputational damage, emotional pain and suffering, resultant out-of-pocket costs and expenses, and punitive damages to punish Defendant Trump for his conduct and deter him and others similarly situated from like acts in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Donald J. Trump for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000, and such other relief as this Court deems just and for a trial by jury on all issues so triable.

### COUNT III – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

131.    Plaintiffs incorporate by reference the averments contained in the foregoing paragraphs of the Complaint as though fully set forth herein at length.

132.    Defendant Trump's conduct toward Plaintiffs at the September 10 debate was extreme and outrageous.

133.    Defendant Trump's conduct toward Plaintiffs at the September 10 debate was part of a continuing pattern of extreme and outrageous conduct dating back several years, thus constituting a continuing tort.

134.    Defendant Trump's conduct intentionally and/or recklessly caused Plaintiffs to suffer severe emotional distress as well as physical injuries.

135.    Defendant Trump acted with ill will and spite, and with wanton, reckless or willful disregard for his conduct's injurious effects on Plaintiffs.

136.    Plaintiff Yusuf Salaam has suffered and will continue to suffer physical injuries as a result of Defendant Trump's extreme and outrageous conduct, including but not limited to nightmares, insomnia, nausea, hypertension, muscle tightening, back pain, neck pain, chest pressure, shortness of breath, hyperventilation, post-traumatic stress disorder, and chronic anxiety.

137.    Plaintiff Raymond Santana has suffered and will continue to suffer physical injuries as a result of Defendant Trump's extreme and outrageous conduct, including but not limited to insomnia, loss of appetite, trembling, migraines, post-traumatic stress disorder, and chronic anxiety.

138.    Plaintiff Kevin Richardson has suffered and will continue to suffer physical injuries as a result of Defendant Trump's extreme and outrageous conduct, including but not limited to nightmares, insomnia, headaches, loss of appetite, muscle tightening, neck pain, back pain, chest pains, chest pressure, numbness, flushing, sweating, shortness of breath, hyperventilation, post-traumatic stress disorder, and chronic anxiety.

139.    Plaintiff Antron Brown has suffered and will continue to suffer physical injuries as a result of Defendant Trump's extreme and outrageous conduct, including but not limited to nightmares, insomnia, shaking, trembling, shortness of breath, hyperventilation, and chronic anxiety.

140.    Plaintiff Korey Wise has suffered and will continue to suffer physical injuries as a result of Defendant Trump's extreme and outrageous conduct, including but not limited to

shortness of breath, hyperventilation, asthma flare-ups, headaches, sweating, flushing, stress rash, post-traumatic stress disorder, and chronic anxiety.

141.    As a proximate result of Defendant's malicious, intentional and reckless conduct as set forth above and herein, Plaintiffs are entitled to such damages as will compensate them for their emotional pain and suffering, physical injuries, resultant out-of-pocket costs and expenses, and punitive damages to punish Defendant Trump for his conduct and deter him and others similarly situated from like acts in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendant Donald J. Trump for compensatory damages, for punitive damages and for costs, in an as yet unliquidated sum in excess of $75,000, and such other relief as this Court deems just and for a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court award Plaintiffs compensatory and punitive damages in an amount to be determined at trial, along with pre- and post-judgment interest, costs and such other relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED:        May 1, 2025

Respectfully Submitted,

By:    _____/s/ Shanin Specter_____
Shanin Specter, Esquire (No. 40928)
Alex Van Dyke, Esquire (No. 334456)
KLINE & SPECTER, P.C.
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000
shanin.specter@klinespecter.com
alex.vandyke@klinespecter.com
*Lead Counsel for all Plaintiffs*

Jane Fisher-Byrialsen, Esquire, *admitted pro hac vice*
David  Fisher, Esquire, *admitted pro hac vice*
FISHER & BYRIALSEN, PLLC
99 Park Avenue
New York, NY 10016
(303) 256-6345
jane@fblaw.org
david@fblaw.org
*Co-Counsel for Plaintiff Wise*

Hollis Whitson, Esquire, *admitted pro hac vice*
SAMLER & WHITSON, P.C.
1600 Stout St. Suite 1400
Denver, CO 80202
(303) 670-0575
hollis@samlerandwhitson.com
*Co-Counsel for Plaintiff Wise*

Jonathan C. Moore, Esquire, *admitted pro hac vice*
Marc Cannan, Esquire, *admitted pro hac vice*
BELDOCK LEVINE & HOFFMAN, LLP
99 Park Avenue
New York, NY 10016
(212) 490-0400
jmoore@blhny.com
mcannan@blhny.com
*Co-Counsel for Plaintiffs Salaam, Santana, Richardson & Brown*